Peter K. Michael
Wyoming Attorney General

James Kaste
Deputy Attorney General

Elizabeth Morrisseau
Assistant Attorney General

Wyoming Attorney General's Office
Kendrick Building
2320 Capitol Avenue
Cheyenne, WY 82002
Ph: (307) 777-6946
Fax: (307) 777-3542
james.kaste@wyo.gov
elizabeth.morrisseau@wyo.gov

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2016 NOV -1  PM 4: 33

STEPHAN HARRIS, CLERK
CHEYENNE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF WYOMING, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil No. 16-CV-271-J |
| VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation; VOLKSWAGEN AKTIENGESELLCHAFT dba VOLKSWAGEN AG and VOLKSWAGEN GROUP, a German corporation; AUDI OF AMERICA, LLC, a Delaware company; AUDI AKTIENGESELLSCHAFT dba AUDI AG, a German corporation; PORSCHE CARS NORTH AMERICA, INC., a Delaware corporation; and DR ING. H.C.F. PORSCHE AG dba PORSCHE AG, a German corporation, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff, the People of the State of Wyoming, at the request of the Department of

Environmental Quality, Air Quality Division, through the Office of the Wyoming Attorney

General, alleges:

## NATURE OF THE ACTION

1.      This is a civil action brought by the People of the State of Wyoming against Volkswagen Group of America, Inc.; Volkswagen Aktiengesellschaft, d/b/a Volkswagen AG and Volkswagen Group; Audi of America, LLC; Audi Aktiengesellschaft, d/b/a Audi AG; Porsche Cars North America, Inc.; and Dr. Ing H. C. F. Porsche AG, d/b/a Porsche AG,  (Defendants), under section 304 of the federal Clean Air Act and sections 901(a) and 903(c) of the Wyoming Environmental Quality Act for past and ongoing violations of the Wyoming Environmental Quality Act and the Wyoming Air Quality Standards and Regulations (Air Quality Rules), made federally enforceable under the Clean Air Act through Wyoming's State Implementation Plan. 42 U.S.C. § 7604.

2.      Defendants developed emission concealing technology designed to hide emissions of nitrogen oxides from model years 2009–2015 from their 2.0 liter and 3.0 liter diesel engines. The emission concealing technology consists of software that engages air pollution controls during emissions testing and disengages or minimizes air pollution controls during all other times. In so doing, Defendants acted in willful contempt of Wyoming's State Implementation Plan, which is Wyoming's federally enforceable program for maintaining the national ambient air quality standards for criteria pollutants, including nitrogen oxides.

3.      Plaintiff now seeks a civil penalty and injunctive relief for these past and ongoing violations of Wyoming's State Implementation Plan.

## PARTIES

4.      The Wyoming Department of Environmental Quality, Air Quality Division, is the agency of Wyoming state government responsible for administering and enforcing air pollution control laws and regulations. Wyo. Stat. Ann. § 9-2-2013 and §§ 35-11-104 and -109.

5.      All actions brought by the Wyoming Department of Environmental Quality are brought in the name of the People of the State of Wyoming. Wyo. Stat. Ann. § 35-11-903(c).

6.      Volkswagen Aktiengesellchaft, d/b/a Volkswagen AG and Volkswagen Group (Volkswagen AG) is a German corporation with its principal place of business in Wolfsburg, Germany.

7.      Volkswagen AG is the parent corporation of both Volkswagen Group of America, Inc., and Audi Aktiengesellschaft, d/b/a Audi AG.

8.      The VW Group is an organizational and trade term referring to Volkswagen AG's automotive brands (including Volkswagen Passenger Cars and subsidiaries Audi and Porsche) and its financial services business.

9.      Volkswagen AG and the VW Group are managed by Volkswagen AG's Board of Management.

10.     A Supervisory Board appoints, monitors, and advises the Board of Management and issues its rules.

11.     Each brand in the VW Group also has its own Brand Board of Management. The members of the Brand Boards of Management manage their respective brands, under targets and requirements laid down by the Volkswagen AG Board of Management.

12.     Audi Aktiengesellschaft, d/b/a Audi AG (Audi AG), is a German corporation with corporate headquarters in Germany. Audi AG is a member of VW Group.

13.     Volkswagen Group of America, Inc., is a New Jersey corporation with corporate headquarters in Virginia that the Wyoming Secretary of State has authorized to do business in the State of Wyoming.

14.     Volkswagen Group of America, Inc., is a wholly-owned subsidiary of Volkswagen AG.

15.     Volkswagen Group of America, Inc., contains the Engineering and Environmental Office, which interacts with United States regulators and handles regulatory compliance for Volkswagen AG and Audi AG.

16.     Audi of America, LLC, is a Delaware limited liability company with corporate headquarters in Virginia.

17.     Audi of America, LLC, is an operating unit of and wholly owned by Volkswagen Group of America, Inc.

18.     Volkswagen Group of America, Inc., is responsible for the acts of Audi of America, LLC.

19.     Audi of America, LLC, is closely controlled and directed by Volkswagen AG and Audi AG.

20.     Dr. Ing H.C.F. Porsche AG, d/b/a Porsche AG (Porsche AG), is a German corporation with corporate headquarters in Germany.

21.     Porsche AG is a wholly-owned subsidiary of Volkswagen AG.

22.     Porsche Cars North America, Inc., is a Delaware corporation with corporate headquarters in Georgia that the Wyoming Secretary of State has authorized to do business in the State of Wyoming.

23.     Porsche Cars North America, Inc., is a wholly-owned subsidiary of Porsche AG.

24.     Porsche AG closely controls and directs Porsche Cars North America, Inc.

25.     Defendants are each individually considered a "person" under the Clean Air Act, the Wyoming Environmental Quality Act, and the Air Quality Rules. 42 U.S.C. § 7602(e); Wyo. Stat. Ann. § 35-11-103(a)(vi); *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 1, § 3.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter in this action under the Clean Air Act. 42 U.S.C. § 7604; *see also* 28 U.S.C. § 1331.

27.     To the extent that any violations alleged in this Complaint are based solely on Wyoming state law, this Court has supplemental jurisdiction over those violations under 28 U.S.C. §1367(a) because they arise from substantially the same set of facts giving rise to the federal claims.

28.     This Court has personal jurisdiction over Defendants because, at all relevant times, they have purposefully availed themselves of this forum.

29.     Defendants are the German automaker Volkswagen AG and its subsidiaries Audi AG and Porsche AG and their wholly-owned American subsidiaries, Volkswagen Group of America, Inc. and Porsche Cars North America, Inc.

30.     At all relevant times, Volkswagen AG, its subsidiaries Audi AG and Porsche AG, and their subsidiaries, Volkswagen Group of America, Inc. and Porsche Cars North America, Inc.:

    a.  Designed the Subject Vehicles, described in paragraph 83 of this Complaint, with their defeat device software, for sale within the United States, including within Wyoming;

    b.  Directed Volkswagen Group of America Inc.'s Michigan-based Engineering and Environmental Office and Porsche Cars North America Inc., to submit to

5

the United States Environmental Protection Agency (EPA) and the California Air Resources Board (CARB) certain submissions and certifications related to selling the Subject Vehicles in the United States, including within Wyoming;

c. Controlled and directed Volkswagen Group of America, Inc., Audi of America, LLC., and Porsche Cars North America, Inc.'s interactions with and messaging to United States regulators and the public in the aftermath of the 2014 independent study that led to the exposure of Volkswagen's fraud to the public.

31.     In addition, Defendants transact or have transacted business in Wyoming between 2008 and 2016 through at least one Wyoming car dealership.

32.     Accordingly, the exercise of specific jurisdiction over all Defendants is consistent with due process.

33.     Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to these claims occurred in Wyoming. 28 U.S.C. § 1391.

## AUTHORITY AND NOTICE

34.     Under the Clean Air Act, the Wyoming Department of Environmental Quality (Department) is a "person" authorized to bring a civil action in federal court to enforce violations of Wyoming's State Implementation Plan. 42 U.S.C. §§ 7602 and 7604; *see also* Wyo. Stat. Ann. § 35-11-901(a).

35.     More than sixty (60) days have elapsed since the Department provided simultaneous notice to the EPA and Defendants of past and ongoing violations of the Wyoming State Implementation Plan. 42 U.S.C. § 7604(b)(1)(A).

36.     The EPA is not pursuing Defendants' past and ongoing violations of Wyoming's State Implementation Plan, so to the extent that federal enforcement would be a bar to state enforcement under section 304 of the Clean Air Act, Wyoming is not barred because EPA is not enforcing the violations described in this Complaint. 42 U.S.C. § 7604(b)(1)(B).

### Regulatory Background

37.     The Clean Air Act establishes a cooperative federalism framework to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

38.     "Air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3).

39.     "Federal financial assistance and leadership is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution." 42 U.S.C. § 7401(a)(4).

40.     The Clean Air Act requires the EPA to develop and issue air quality criteria for pollutants that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare" and which are present in the ambient air from "numerous and diverse mobile or stationary sources." 42 U.S.C. § 7408(a)(1)(A) and (B).

41.     The EPA must promulgate national ambient air quality standards for each criteria pollutant. 42 U.S.C. § 7409.

42.     The EPA has promulgated such standards for sulfur oxides, nitrogen oxides, carbon monoxide, ozone, particulate matter, and lead. 40 C.F.R. § 50.

43. Under the Act, each State must develop and submit a state implementation plan that provides for the implementation, maintenance, and enforcement of the national ambient air quality standards for each criteria pollutant. 42 U.S.C. § 7410.

44. The EPA has the authority to disprove a state implementation plan and impose a federal implementation plan when the agency determines that a state is incapable of implementing, maintaining, and enforcing one or more aspects of air pollution control related to a specific criteria pollutant. 42 U.S.C. § 7410(b).

45. Once the EPA approves a state implementation plan, it becomes federally enforceable, by the EPA, a state, or a citizen. 42 U.S.C. §§ 7413 and 7604.

46. Wyoming has had an approved, federally enforceable state implementation plan in place since 1972. Approval and Promulgation of Implementation Plans, 37 Fed. Reg. 10842 (May 31, 1972).

47. Since its inception, Wyoming's State Implementation Plan has barred the concealment of emissions from sources, which extends to the concealment of emissions of nitrogen oxides from mobile sources. *Id.*

48. Wyoming's State Implementation Plan has included requirements that bar tampering or removing federally required controls from mobile sources since 2004. These requirements ensure compliance with federally established emission limits for mobile sources by barring the removal or tampering with of associated federally required control devices or systems. Approval and Promulgation of Air Quality Implementation Plans; Wyoming; Restructuring and Renumbering of Wyoming Air Quality Standards and Regulations, 69 Fed. Reg. 44965 (Jul. 28, 2004).

8

## Background – Wyoming Environmental Quality Act

49.      The Wyoming Environmental Quality Act establishes a statutory scheme that is designed in part to enable the State of Wyoming to prevent, reduce, and eliminate pollution; to preserve and enhance the State of Wyoming's air, water, and land resources; and to allow the State of Wyoming to plan the development, use, reclamation, and enhancement of its air, land, and water resources. Wyo. Stat. Ann. § 35-11-102.

50.      The Wyoming Environmental Quality Act states, "[N]o person shall cause, threaten or allow the discharge or emission of any air contaminant in any form so as to cause pollution which violates rules, regulations and standards adopted by the [Environmental Quality C]ouncil." Wyo. Stat. Ann. § 35-11-201.

51.      Chapter 1, section 4 of the Air Quality Rules bars the installation or use of any device or contrivance that dilutes or conceals emissions from a source, without resulting in a decrease in emissions reductions. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 1, § 4.

> a. This language was first incorporated into Wyoming's State Implementation Plan in 1972. Approval and Promulgation of Implementation Plans, 37 Fed. Reg. 10842 (May 31, 1972).
>
> b. As a result of reorganization of the Wyoming Statues, this language was placed into the Air Quality Rules and subsequently incorporated into Wyoming's State Implementation Plan on July 28, 2004. Approval and Promulgation of Air Quality Implementation Plans; Wyoming; Restructuring and Renumbering of Wyoming Air Quality Standards and Regulations, 69 Fed. Reg. 44965 (Jul. 28, 2004).

52.     Chapter 13, section 2 of the Air Quality Rules prohibits tampering with federally-required air pollution control devices and systems installed on motor vehicles. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 13, § 2. This regulatory section was incorporated into Wyoming's State Implementation Plan in 2004. 69 Fed. Reg. 44965.

53.     Nitrogen oxides are air contaminants under the Wyoming Environmental Quality Act and Wyoming's State Implementation Plan. Wyo. Stat. Ann. § 35-11-103(b)(i); 40 C.F.R. § 52.2620, subpart ZZ.

54.     Ground-level ozone is an air contaminant under the Wyoming Environmental Quality Act and Wyoming's State Implementation Plan. *Id.*

55.     Fine particulate matter is an air contaminant under the Wyoming Environmental Quality Act and Wyoming's State Implementation Plan. *Id.*

56.     Nitrogen oxides, ground-level ozone, and fine particulate matter individually and collectively comprise air pollution under the Wyoming Environmental Quality Act and Wyoming's State Implementation Plan. Wyo. Stat. Ann. § 35-11-103(b)(ii); 40 C.F.R. § 52.2620, subpart ZZ.

57.     Short-term exposure to nitrogen oxides can negatively impact the health of individuals with asthma. Primary National Ambient Air Quality Standards for Nitrogen Dioxide; Final Rule, 75 Fed. Reg. 6474 (Feb. 9, 2010).

58.     Long-term exposure to nitrogen oxides can cause increased respiratory illnesses among children. *Id.*

59.     Children, the elderly, and those with pre-existing respiratory illnesses, including asthma, are more susceptible to negative health impacts from short-term and long-term exposure to nitrogen oxides. *Id.*

60.     Both short-term and long-term exposure to ozone can cause harmful health effects. National Ambient Air Quality Standards for Ozone, 79 Fed. Reg. 75234, 75236 (Dec. 17, 2014).

61.     Short-term exposure to ozone can have harmful respiratory effects, especially for young children, the elderly, and people with asthma. *Id.*

62.     Short-term exposure to ozone is linked to increased hospital visits and emergency room admissions, especially for young children, the elderly, and people with asthma. *Id.*

63.     Both short-term and long-term exposure to particulate matter can cause harmful health effects. National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 3086 (Jan. 15, 2013).

64.     Exposure to particulate matter can have harmful respiratory and cardiac effects, especially for young children, the elderly, and people with pre-existing heart and lung conditions. *Id.*

65.     Exposure to particulate matter is linked with premature mortality, increased hospital and emergency room admissions, and the development of chronic respiratory disease. *Id.*

66.     Fine particulate matter can cause reduced visibility or regional haze. *Id.* at 3183.

67.     Nitrogen oxides can cause reduced visibility or regional haze. Regional Haze Regulations; Final Rule, 64 Fed. Reg. 35714 (July 1, 1999).

68.     Ozone can cause reduced visibility or regional haze. *Id.*

### Definitions

69.     The Wyoming Environmental Quality Act defines "air contaminant" as "odorous material, dust, fumes, mist, smoke, other particulate matter, vapor, gas or any combination of the

11

foregoing, but shall not include steam or water vapor." Wyo. Stat. Ann. § 35-11-103(b)(i). This statutory language was incorporated into Wyoming's State Implementation Plan in 1972. 37 Fed. Reg. 10842.

70.     The Air Quality Title of the Wyoming Environmental Quality Act defines "air pollution" to be "the presence in the outdoor atmosphere of one (1) or more air contaminants in such quantities and duration which may be injurious to human health or welfare, animal or plant life, or property, or unreasonably interferes with the enjoyment of life or property." Wyo. Stat. Ann. § 35-11-103(b)(ii). This statutory language was incorporated into Wyoming's State Implementation Plan in 1972. 37 Fed. Reg. 10842.

71.     The Wyoming Environmental Quality Act defines "emission" as "a release into the outdoor atmosphere of air contaminants." Wyo. Stat. Ann. § 35-11-103(b)(iv). This statutory language was incorporated into Wyoming's State Implementation Plan in 1972. 37 Fed. Reg. 10842.

72.     The Air Quality Rules defines "control equipment" as "any device, contrivance, or system which prevents or reduces emissions." *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 1, § 3. This statutory language was incorporated into Wyoming's State Implementation Plan in 1972. 37 Fed. Reg. 10842. This section was most recently approved by EPA in 2013. Approval and Promulgation of Air Quality Implementation Plans; rescission of Federal Implementation Plan; Wyoming; Prevention of Significant Deterioration; Greenhouse Gas Tailoring Rule Revisions, 78 Fed. Reg. 69998. (Nov. 22, 2013).

73.     The Air Quality Rules defines "motor vehicle" as "those vehicles carrying people or goods on public streets or highways." *Rules Wyo. Dep't of Envtl. Quality,*

*Air Quality*, ch. 1, § 3. This regulatory section was incorporated into Wyoming's State Implementation Plan in 2004. 69 Fed. Reg. 44965.

74.     The Air Quality Rules defines a "source" as "any property, real or personal, or person contributing to air pollution. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 1, § 3. This statutory language was incorporated into Wyoming's State Implementation in 1972. 37 Fed. Reg. 10842. This section was most recently approved by EPA in 2013. 78 Fed. Reg. 69998.

### Factual Allegations

75.     At all times material to this complaint, Defendants worked in concert with the common objective of engaging in the emissions cheating schemes described herein. Each Defendant was, and still is, an agent of the other Defendants for the achievement of this common objective, and each has acted, and is acting, for the common goals and profit of all Defendants. Therefore, all acts and knowledge ascribed to one Defendant are properly imputed to the others.

76.     At all relevant times, each Defendant acted: (a) as a principal; (b) under express or implied agency; or (c) with actual or ostensible authority to perform the acts alleged in this Complaint on behalf of every other named Defendant.

77.     At all relevant times, each Defendant knew or should have known that the other Defendants were engaging in or planned to engage in violations of law alleged in this Complaint. Despite knowing that the other Defendants were engaging in such unlawful conduct (or despite the fact that they should have known that the other Defendants were engaging in such unlawful conduct), each Defendant nonetheless facilitated the commission of those unlawful acts.

78.     Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts and, thereby, aided and abetted the other Defendants in the unlawful conduct.

79.     At a minimum, each Defendant knowingly and intentionally provided other Defendants with substantial assistance, or aided and abetted other Defendants, in carrying out the emissions cheating schemes described herein.

80.     Each Defendant engaged in multiple violations of Wyoming's State Implementation Plan.

**A.     Volkswagen introduced diesel vehicles with the defeat device into the United States market.**

81.     Beginning in the 1990s, Volkswagen rapidly expanded its sales of light duty diesel vehicles in Europe. To build on its success in Europe, and in response to Toyota's commercial growth in the United States with its environmentally advanced hybrid technology, Volkswagen designed and developed a line of diesel turbocharged direct injection (TDI) 2.0 and 3.0 liter light duty diesel vehicles (Subject Vehicles) for marketing and sale throughout the United States, including in Wyoming.

82.     Through marketing and advertising, Volkswagen sought to transform the American reputation of diesel engine vehicles as noisy and smoky workhorses into one of smooth-running, high-technology automotive engines that would simultaneously deliver fuel efficiency, high performance, and low emissions of nitrogen oxides.

83.     The Subject Vehicles include the following makes and models sold or leased in the United States for the 2009 through 2016 model years:

### 2.0 Liter Diesel Models

| Model Year (MY) | Generation (Gen)/Engine | EPA Test Group | Vehicle Make and Model(s) |
|---|---|---|---|
| 2009 | Gen 1 / EA189 | 9VWXV02.035N 9VWXV02.0U5N | VW Jetta, VW Jetta Sportwagen |

| 2010 | Gen 1 / EA189 | AVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2011 | Gen 1 / EA189 | BVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2012 | Gen 1 / EA189 | CVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2013 | Gen 1 / EA189 | DVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2014 | Gen 1 / EA189 | EVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen |
| 2012<br>2013<br>2014 | Gen 2 / EA189 | CVWXV02.0U4S<br>DVWXV02.0U4S<br>EVWXV02.0U4S | VW Passat |
| 2015 | Gen 3 / EA288 | FVGAV02.0VAL | VW Beetle, VW Beetle Convertible, VW Golf, VW Golf Sportwagen, VW Jetta, VW Passat, Audi A3 |

### 3.0 Liter Diesel Models

| Model Year (MY) | EPA Test Group(s) | Vehicle Make and Model(s) |
|---|---|---|
| 2009 | 9ADXT03.03LD | VW Touareg<br>Audi Q7 |
| 2010 | AADXT03.03LD | VW Touareg<br>Audi Q7 |
| 2011 | BADXT03.02UG<br>BADXT03.03UG | VW Touareg<br>Audi Q7 |
| 2012 | CADXT03.02UG<br>CADXT03.03UG | VW Touareg<br>Audi Q7 |
| 2013 | DADXT03.02UG<br>DADXT03.03UG<br>DPRXT03.0CDD | VW Touareg<br>Audi Q7<br>Porsche Cayenne Diesel |
| 2014 | EADXT03.02UG<br>EADXT03.03UG<br>EPRXT03.0CDD<br>EADXJ03.04UG | VW Touareg<br>Audi Q7<br>Porsche Cayenne Diesel<br>Audi A6 Quattro, A7 Quattro, A8, A8L, Q5 |

| 2015 | FVGAT03.0NU2<br>FVGAT03.0NU3<br>FPRXT03.0CDD<br>FVGAJ03.0NU4 | VW Touareg<br>Audi Q7<br>Porsche Cayenne Diesel<br>Audi A6 Quattro, A7 Quattro, A8, A8L, Q5 |
|------|------------------------------------------------------------|----------------------------------------------------------------------------------------------|
| 2016 | GVGAT03.0NU2<br>GPRXT03.0CDD<br>GVGAJ03.0NU4               | VW Touareg<br>Porsche Cayenne Diesel<br>Audi A6 Quattro, A7 Quattro, A8, A8L, Q5             |

84. For clarity, this Complaint will refer to the 2.0 liter Generation 1/EA-189s, the Generation 2/EA-189s, and the Generation 3/EA-288s identified above as "Generation 1s," "Generation 2s," and "Generation 3s" respectively, and will refer to them collectively as the model "2Ls." This Complaint will refer to 3.0 liter models collectively as the model "3Ls." The model 2Ls and 3Ls will be referred to collectively as Subject Vehicles.

85. As of November 1, 2015, there were 1,196 Subject Vehicles registered in Wyoming with the Wyoming Department of Motor Vehicles.

86. As described in more detail below, the diesel exhaust after-treatment technology Volkswagen designed and installed in the subject vehicles changed over time and across engine generations, but certain key emissions control features remained constant: all Subject Vehicles were equipped with a diesel particulate filter and employed exhaust gas recirculation.

87. Exhaust gas recirculation is used primarily to reduce emissions of nitrogen oxides by diverting exhaust gases to the intake system and mixing them with fresh air, thereby thinning the fresh air, lowering the combustion temperature, and reducing the creation of nitrogen oxides.

88. The diesel particulate filter serves to filter emissions of particulate matter from the engine exhaust stream. It must be emptied or regenerated to oxidize carbon to carbon dioxide at regular intervals in order to control particulate emissions as intended.

89.     Exhaust gas recirculation and diesel particulate filters are both pollution control devices that federal law requires to be installed on motor vehicles. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 13, § 2(a); 42 U.S.C. § 7521.

90.     While both technologies have emissions-related advantages (reducing emissions of nitrogen oxides in the case of exhaust gas recirculation and reducing emissions of particulate matter in the case of the diesel particulate filter), they also have disadvantages:

a.  Using exhaust gas recirculation increases emissions of particulate matter, and necessitates more frequent diesel particulate filter regeneration to prevent clogging, thereby straining the filter and increasing the risk of premature filter failures.

b.  Regeneration of the diesel particulate filter increases emissions of nitrogen oxides, increases fuel consumption, and strains the engine and the components of the emissions control system, including the filter, due to the high temperatures needed for regeneration.

91.     Volkswagen chose to cheat, rather than solve, these engineering challenges by creating and installing the defeat device on the Subject Vehicles.

92.     Defeat devices are illegal under the Clean Air Act and the Wyoming State Implementation Plan. 42 U.S.C. § 7522(a)(3)(B); *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 13.

**B.      Volkswagen developed, refined, and installed the defeat device across six different emissions control systems and lines of vehicles.**

93.     In trying to leverage its existing diesel engine technology for the United States market, Volkswagen faced an engineering challenge: diesel engines, though generally more fuel-

efficient than gasoline engines, have high emissions of nitrogen oxides, making compliance with United States regulations particularly challenging.

94.     Volkswagen's implementation of the defeat device was not a one-time, isolated event. Rather, Volkswagen engaged in a decade-long process of developing and refining the defeat device for use in multiple lines of Volkswagen, Audi, and Porsche vehicles.

i.     **The First Defeat Device: Audi's Model Year 2004-2008 V6 (European Market)**

95.     Volkswagen encountered early emissions-related engineering challenges in 1999 when it was developing its large 3.0 liter V6 diesel luxury cars for the European market.

96.     Engineers at Audi AG headquarters in Neckarsulm, Germany, had developed a new technology for the engine called "Pilot Injection" that could eliminate the traditional clattering noise of diesel engines at start-up through the injection of additional fuel into the engine on ignition. However, activation of Pilot Injection upon ignition caused the engine to exceed European emissions standards during the laboratory test cycle on the rolling dynamometer (dyno) the European authorities used for emissions testing.

97.     Audi chose to solve this problem by developing software for the engine control unit that allowed the engine to deactivate Pilot Injection during European dyno testing.

98.     Technology that recognizes when a vehicle is undergoing dyno testing and runs the engine in a less polluting way than on the road in order to defeat an emissions testing regime is known in the industry as a "cycle-beater" and is known legally as a "defeat device."

99.     Audi developed and deployed this cycle-beating defeat device software on its European-market Audi 3.0-liter V6 diesels from 2004-2008. Because of its noise-reducing properties, Audi dubbed this defeat device the "Acoustic Function."

ii.      The Second Defeat Device: Volkswagen's Generation 1s

100.    Volkswagen faced an engineering challenge when trying to break through in the American diesel vehicle market: diesel engines are high emitters of nitrogen oxides, making compliance with United States regulation of emissions of nitrogen oxides challenging.

101.    In the early-mid 2000s, Volkswagen explored equipping its Generation 1 engines with selective catalytic reduction emissions technology, which chemically reduces emissions of nitrogen oxides by spraying liquid urea in the exhaust stream. This technology is essentially a wet scrubber – the urea tank stores liquid urea that is sprayed through the selective catalytic reductions process to reduce the total amount of nitrogen oxides emitted through the tailpipe. If there is not enough liquid urea in the tank, the selective catalytic reductions process cannot work.

102.    In 2006, however, rather than try to fit its first Generation 1 offering (the small model year 2009 Jetta) with one or more of several-gallon urea tanks, Volkswagen decided to develop a simpler, in-house emissions system, known as a Lean-$NO_x$ Trap (Lean Trap). The Lean Trap does not depend on selective catalytic reduction and, thus, does not require urea tanks.

103.    The Lean Trap emissions system operates by trapping the emissions of nitrogen oxides in a catalytic converter and then periodically running the engine in a fuel rich, oxygen-lean mode to activate the catalytic converter and break down the stored nitrogen oxides into benign nitrogen and oxygen.

104.    Early in the development of the Lean Trap system, it became apparent to Volkswagen's engineers that activating the Lean Trap as frequently as necessary to bring emissions of nitrogen oxides within legal limits would produce too much particulate matter. That particulate matter would in turn clog and break the engine's diesel particulate filter within just 50,000 miles of operation—many times less than the 120,000 (later 150,000) mile full useful life

19

United States durability standard Volkswagen was required to meet. Emission Durability Procedures and Component Durability Procedures for New Light-Duty Vehicles, Light-Duty Trucks and Heavy-Duty Vehicles; Final Rule and Proposed Rule, 71 Fed. Reg. 2810 (Jan. 17, 2006).

105.    Volkswagen's engineers further determined that running the Exhaust Gas Recirculation to reduce emissions of nitrogen oxides would produce even more particulate matter that would further overwhelm the car's particulate matter filter and prematurely break down other engine components as well.

106.    Rather than solving these challenges legally, in late 2006, Volkswagen's Wolfsburg engineers adapted Audi's "Acoustic Function" cycle-beating software.

107.    With the knowledge and approval of their managers, Volkswagen engineers calibrated the existing Acoustic Function test-recognition software to increase Lean Trap activation and exhaust gas recirculation to bring emissions of nitrogen oxides within compliant levels during dyno testing. During normal driving conditions, however, the cycle-beating defeat device operated to reduce Lean Trap regenerations by about 90% and radically scale back the exhaust gas recirculation, substantially increasing emissions of nitrogen oxides.

108.    Volkswagen incorporated the Lean Trap regeneration and exhaust gas recirculation defeat devices described directly above in the engine control units of the 2009-2014 Jetta, Golf, A3, and New Beetle diesel models, collectively over 300,000 vehicles sold in the United States, at least two thousand of which regularly drive on Wyoming roads and highways.

### iii.    The Third Defeat Device: Audi's 3L Sport Utility Vehicles

109.    At the same time as Volkswagen engineers in Wolfsburg were developing the Generation 1 diesel engine, their colleagues at Audi's Neckarsulm headquarters were developing

20

a 3.0 liter diesel engine for the anticipated release in model year 2009 of a new line of luxury diesel sport utility vehicles in the United States market: Audi Q7 and Volkswagen Touareg, both equipped with selective catalytic reduction systems.

110.    Adaptation of its European selective catalytic reduction technology for the United States market presented a challenge: to comply with more stringent United States nitrogen oxides limits and an EPA rule that tied urea tank refills to the 10,000 mile service intervals, Audi's 3.0 liter vehicles in the United States would require larger urea tanks than their European counterparts.

111.    In or around July 2006, the issue reached the attention of then-Audi AG (later Volkswagen AG) CEO Martin Winterkorn and then-head of Volkswagen AG Quality Control Matthias Mueller (now Mr. Winterkorn's successor as CEO of Volkswagen AG).

112.    Rather than expending the time and money necessary to re-engineer the 3Ls to enable them to comply with United States emissions standards, Volkswagen and Audi management tasked the diesel and emissions engineers with making the too-small urea tanks last for 10,000 miles between refills; something they accomplished only by employing yet more defeat device software.

113.    In addition to the exhaust gas recirculation defeat device implanted in the Generation 1s, the 3Ls also featured a urea-dosing defeat device. The urea-dosing defeat device operated to increase urea dosing when the engine software recognized an emissions test cycle and reduce the urea dosing to an artificial limit during real driving conditions to enable the too-small urea tanks to last for 10,000 miles between service intervals.

114.    Audi approved and installed both the urea-dosing defeat device and the exhaust gas recirculation defeat device for production into the 3Ls for sale in the United States market

from 2009-2016. The effect of these defeat devices on the 3Ls was to increase emissions of nitrogen oxides to roughly nine times the legal limit in everyday driving conditions.

### iv.     The Fourth Defeat Device: Volkswagen's Generation 2s

115.    In 2009, in connection with the planned roll-out of the selective catalytic reduction-equipped model year 2012 Passat, Volkswagen's engineers faced the same quandary as their colleagues at Audi:  insufficient space in the vehicle chassis to incorporate urea tanks large enough to meet the 10,000 mile EPA refill interval requirement.

116.    Rather than resolve this engineering challenge or mitigate it by certifying the vehicles to shorter service intervals, Volkswagen again opted to implement defeat device software like that used by their Audi colleagues for the 3Ls. Once the software recognized the vehicle was on a dyno, it optimized the urea dosing and exhaust gas recirculation to bring the emissions of nitrogen oxides within regulatory limits. Outside of test conditions, however, the cycle-beating defeat device software reduced the urea dosing rate by half to conserve urea and also reduced exhaust gas recirculation. The engine control unit software further limited diesel particulate filter regeneration to reduce the strain on the filter.

117.    With the approval of Volkswagen supervisory executives, company engineers went forward with the dosing and exhaust gas recirculation defeat devices, installing them in roughly 80,000 Volkswagen Passats in the United States market, including in Wyoming, spanning from model years 2012 to 2014. As a result, in real-world conditions, the Generation 2s sold in the United States emitted nitrogen oxides at levels of five to twenty times the federal limits.

### v.    The Fifth Defeat Device: the Porsche Cayenne

118.    In 2010, Volkswagen AG acquired Porsche, and the founding family of Porsche became Volkswagen's leading shareholders. The following year, Porsche decided it too wanted to enter the United States diesel market with its new Cayenne sport utility vehicle.

119.    Porsche approached its sister company Audi about acquiring Audi's 3L liter V6 diesel engine for use in the Cayenne. Audi agreed to supply Porsche with the engine, lightly re-tuned for Porsche. In supplying the engine, Audi personnel educated their counterparts at Porsche about the engine's primary features, including its urea-dosing system.

120.    In communications in or around September 2011 that included Audi engineer Martin Gruber, the then-head of Volkswagen Engine Development, Ulrich Hackenburg, and Porsche's electronic development chief, Carsten Schauer, among others, Audi explained to Porsche personnel the 3Ls' urea tank-size limitation: the EPA requirement tying urea refills to 10,000 mile service intervals, and the resulting low urea-dosing strategy that Audi had devised.

121.    Porsche's engineering department, then led by Wolfgang Hatz, proceeded to source the Audi defeat-device equipped 3.0 liter engine for its entry into the United States diesel market with the model year 2013 Cayenne diesel sport utility vehicle.

122.    Approximately 13,600 Porsche equipped with this defeat device were sold in the United States, including in Wyoming.

123.    With the defeat device, subject Porsche Cayennes are estimated to emit nitrogen oxides at roughly nine times the legal limit.

### vi. The Sixth Defeat Device: Volkswagen's Generation 3s

124. In or about 2013, Volkswagen discontinued the Lean Trap emissions system in favor of a selective catalytic reduction-based system for all its model year 2015 2.0s (the Beetle, Golf, Jetta, Passat, and the Audi A3).

125. In doing so, Volkswagen again opted to implement urea-dosing and exhaust gas recirculation defeat devices like those it implemented in the Generation 2s and 3s.

126. Volkswagen sold nearly 100,000 model year 2015 Generation 3s, including in Wyoming. Defendants continued to sell these vehicles even after they became aware of independent real-world studies that demonstrated that the Subject Vehicles were emitting nitrogen oxides in real driving conditions far in excess of the legal limits.

### C. Volkswagen and Audi implemented defeat devices fully knowing they were illegal.

127. From the inception of its 2006 plan to launch the Subject Vehicles in the United States, Volkswagen intensively researched whether it could pass off the various defeat devices as emission increasing auxiliary emission control devices, which can be legal when disclosed.

128. Emission increasing auxiliary emission control devices may be legal if they are designed to run only in limited, extreme driving circumstances to protect the engine, the automaker discloses them to the regulators, and the regulators determine the software is not designed primarily to cheat the emissions test. 40 C.F.R. § 89.107.

129. On October 3, 2006, multiple executives and managers from Volkswagen AG (Richard Dorenkamp, Dr. Achim Freitag, James Liang, Juergen Peter, Detlef Stendel, and Burkhard Veldten), Audi AG (Klaus Appel, Dr. Armin Burkardt, Carsten Nagel, and Giovanni Pamio) and the United States affiliate Volkswagen Group of America Inc.'s Engineering and Environmental Office (Leonard Kata and Norbert Krause) met with CARB officials to provide a

"technical description of future light-duty diesel emission control strategies [lean trap and selective catalytic reduction] and to discuss emission certification implications (e.g., timing)."

130.    According to Volkswagen's meeting report, during that meeting, CARB officials repeatedly requested "additional detail regarding [auxiliary emission control devices]." The report documents that, as a follow-up, "[Volkswagen Group of America Inc.'s Engineering and Environmental Office], Volkswagen AG, and Audi AG [were] to review regulations to help identify [auxiliary emission control devices], particularly [emission-increasing auxiliary emission control devices]." They further promised to provide CARB a more complete description of the auxiliary emission control devices by Spring 2007, in particular noting, "[p]er [C]ARB request, identify, describe function (e.g., activate, deactivate, or modulate the operation of emission control devices), describe effect on emission levels[.]"

131.    Following the October 3, 2006, meeting with CARB, Volkswagen and Audi had internal discussions regarding auxiliary emission control devices and defeat devices, in both the German and United States offices.

132.    In a November 2006 email to several colleagues at Volkswagen Group of America, Inc., and engineers at Audi AG and Volkswagen AG in Germany, Engineering and Environmental Office official Stuart Johnson explained, "almost all [auxiliary emission control devices] are really calibration issues and strategies, such as having a timing shift for engine starts, shutting off [exhaust gas recirculation] certain modes such as extended idle to prevent plugging, timing changes for altitude, etc… The agencies are really focused on how often an [auxiliary emission control device] is used." Johnson referenced an earlier lawsuit in which heavy-duty engine manufacturers were caught using "cycle beating strategies [with] timers . . . that enacted the injection timing change once the engine was in a mode for a specific length of

time" as a "clear violation of the spirit of the emission regulations and the certification test procedure."

133.    A few days later, Leonard Kata, Manager of Emission Regulations and Certification at Volkswagen Group of America, Inc., Engineering and Environmental Office emailed multiple Volkswagen AG and Audi AG managers, noting:

> In connection with the introduction of future diesel products, there has been considerable discussion recently regarding the identification of Auxiliary Emission Control Devices (AECDs).... The agencies' interest in the identification of AECDs is to determine whether any of these devices can be considered a defeat device.

134.    In that same email, Kana went on to explain how an exhaust gas recirculation system that runs differently under test conditions than in real driving conditions – a central function of the defeat device software installed in all of the Subject Vehicles – would constitute a defeat device:

> EPA also discusses the concept of the existence of a defeat device strategy if a manufacturer's choice of basic design strategy cannot provide the same degree of emission control during both [emissions-test cycle] and [non-emissions-test-cycle] operation when compared with other systems available in the industry. A simple example is an [exhaust gas recirculation] system that provides adequate performance under [emissions-test cycle] conditions, but insufficient performance under non-[emissions-test cycle] conditions (e.g., higher speed, load or temperature). This lack of control under [non-emissions-test cycle] conditions will be considered a defeat device.

135.    In an attachment to the same email, Kata explained:

> Both EPA and [C]ARB define a defeat device as an [auxiliary emission control device] "...that reduces the effectiveness of the emission control system under conditions that may reasonably be expected to be encountered in normal vehicle operation and use unless: (1) Such conditions are substantially included in the Federal emission test procedure; (2) The need for the [auxiliary emission control device] is justified in terms of protecting the vehicle against damage or accident; or (3) The [auxiliary emission control device] does not go beyond the requirement of engine starting."

136.    On March 21, 2007, multiple managers and engineers at Volkswagen AG (Richard Dorenkamp, James Liang, and Juergen Peter), Audi AG (Klaus Appel, Dr. Armin Burkardt, Giovanni Pamio, and Lothar Rech) and Volkswagen Group of America, Inc., Engineering and Environmental Office (Leonard Kata and Norbert Krause) had a follow-up meeting with CARB "to discuss the Auxiliary Emission Control Devices (AECDs) associated with the diesel concepts presented." A Volkswagen Meeting Report summarizing the discussion states, in relevant part:

> VW position regarding "normal vehicle operation" is that the light-duty vehicle emission test procedures cover normal vehicle operation in customer's hands. [CARB official] Duc Nguyen expects emission control systems to work during conditions outside of the emissions tests. Volkswagen agrees.

137.    Despite being fully aware that defeat devices are illegal in the United States, Volkswagen, Audi, and Porsche proceeded to roll out hundreds of thousands of diesel vehicles with 2.0 and 3.0 liter engines onto the American market, including in Wyoming, from 2009 through 2016 Model Years, all of which featured undisclosed illegal defeat devices.

**D.    Internally, Volkswagen and Audi executives and engineers openly discussed developing defeat devices.**

138.    While Defendants were assuring CARB that their emissions-control systems would work during real world driving conditions, executives and engineers within their Powertrain Development departments were developing and implementing emissions-increasing defeat devices as part of the normal course of business.

139.    Discussions concerning defeat device development and implementation taking place over nearly a decade included dozens of executives, senior managers, and engineers, including for example:

a. Frank Tuch (2010 – 2015 head of Volkswagen AG Quality Management and a direct report to Volkswagen AG CEO and Management Board Member, Martin Winterkorn);

b. Bernd Gottweis (2007-2014 head of Product Safety within Volkswagen AG Quality Management);

c. Rudolf Krebs, Jens Hadler, Heinz-Jakob Neusser, and Friedrich Eichler (heads of Volkswagen AG's Powertrain Development from 2005-2007, 2007-2011, 2011-2013, and 2013-2015, respectively);

d. Multiple Volkswagen AG division heads, including Hanno Jelden (head of Drive Electronics from November 2005 – September 2015), Falko Rudolph (Diesel Engine Development from November 2006 – September 2010), Stefanie Jauns-Seyfried (head of Functions and Software Development within Powertrain Electronics from November 2005 – September 2015), Richard Dorenkamp and Thorsten Duesterdiek (former (2003-2013) and current (2013-present) heads of Ultra-low Emissions Engines and Exhaust Post-Treatment within Diesel Engine Development), Hermann-Josef Engler (head of Diesel Engine Development for Four-Cylinder Passenger Car Engines), and Mathias Klaproth (head of Diesel System Applications within Powertrain Electronics);

e. Numerous managers and engineers within these divisions, including Burkhard Veldten, Volker Gehrke, and Dieter Mannigel (in Diesel Engine Functions within Powertrain Electronics' Functions and Software Development department), and Andreas Specht, Hartmut Stehr, Michael Greiner, and James

Liang (in Procedures and Exhaust Post-Treatment within the Diesel Engine Development);

f.  Top Audi engineers, including Giovanni Pamio (General Manager of V6 Diesel Engines), Henning Loerch (Director of Diesel Exhaust Gas After-treatment for V6 Engines), and Martin Gruber (Director of Audi Diesel Engine Thermodynamics Department); and

g.  Carsten Schauer, the Chief of Porsche Electronics Development.

140.   Among other things, communications among these individuals detail the use of the defeat devices to reduce raw emissions during test cycles and reduce exhaust gas recirculation and diesel particulate filter regeneration during real driving conditions, and otherwise describe the expansion, modification, and optimization of the cycle-beating Acoustic Function, well into 2014.

141.   A February 29, 2016, statement of defense filed by Volkswagen in a pending European shareholder lawsuit provides insight why, in light of its knowledge of the illegality of its conduct and potential associated fines, Volkswagen still decided to proceed with its emissions cheating scheme:

> Under the Clean Air Act, violations of the statutory emission standards may be sanctioned by fines called civil penalties. While these fines may be as much as U.S. $37,500 per vehicle and are thus in theory quite high, the statutory maximum amounts have to date played no role in practice. Nonetheless, they define the available range of penalties for the relevant U.S. authorities and are thus routinely cited in the corresponding notices – as was also the case with the EPA's Notice of Violation of 18 September 2015.
>
> ***
>
> Regardless of the statutory maximum amounts and the abstract presentation of the fine assessment criteria in the law, fines in practice do not even approach the upper end of the range, especially in cases involving passenger cars in large numbers (instead of heavy trucks).

**E.    Volkswagen and Audi continued to deny the existence of defeat devices and mislead regulators.**

142.    While acknowledging the defeat devices relatively openly in internal communications, Volkswagen and Audi sought to conceal the defeat devices from regulators, researchers, and the public. Among other things, they:

      a.    Directed the removal of reference to the defeat device (or the "acoustic function" as it was called internally) from engine control unit documentation;

      b.    Buried the results of 2012-2013 internal testing that reflected real world emissions of nitrogen oxides that exceeded United States limits by many multiples;

      c.    Denied independent researchers access to data that would confirm discrepancies in emissions of nitrogen oxides between testing and real driving conditions in Volkswagen's United States fleet; and,

      d.    Failed to disclose the illegal, emissions-increasing defeat devices in their certification-related submissions to state and federal regulators while falsely representing full compliance with applicable emissions and durability standards.

      i.    **Volkswagen's initial reaction to the ICCT Report**

143.    On March 31, 2014, an Audi AG engineer alerted colleagues at Volkswagen AG and Volkswagen Group of America, Inc., Engineering and Environmental Office to the upcoming publication of a report by the West Virginia University's Center for Alternative Fuels, Engines & Emissions commissioned by the International Council on Clean Transportation (the ICCT Report). The ICTT Report found real world emissions from two of the three light duty

diesel vehicles it tested contained levels of nitrogen oxides between five and thirty-five times higher than the legal emissions limits. West Virginia University researchers conducted the tests using a portable emissions measurement system that allows for emission testing during real-world conditions, instead of using a dynamometer.

144.    Multiple Volkswagen and Audi communications expressed anxiety that the failed vehicles were Volkswagens.

145.    ICCT researchers confirmed those fears when they told Volkswagen Group of America, Inc., Engineering and Environmental Office that failed vehicles were a 2012 Jetta and a 2013 Passat.

146.    Shortly thereafter, Volkswagen Group of America, Inc., Engineering and Environmental Office began fielding calls and requests for reports and analyses of the ICCT Report from multiple high-ranking Volkswagen executives, including Michael Horn (then-CEO and President of Volkswagen Group of America), Carsten Krebs (a Director at Volkswagen Group of America), Frank Tuch (then-head of Group Quality Management for Volkswagen AG), Bernd Gottweis (then-head of Product Safety within Volkswagen AG Group Quality Management), and Christian Klingler (then-Volkswagen AG Management Board member responsible for Sales and Marketing).

147.    Documents and information provided by managing engineers at Volkswagen AG, Audi AG, Volkswagen Group of America, Inc., and Audi of America, LLC (including several engineers who participated in the design and implementation of the defeat devices in the early 2000s) to multiple senior management officials (including Martin Winterkorn, then-CEO of Volkswagen AG and Chairman of its Board of Management, and Christian Klingler, then-member of Volkswagen AG's Board of Management responsible for Sales and Marketing) in the

31

immediate aftermath of the ICCT report demonstrate that, from Volkswagen group level management all the way down, it was well-understood that:

    a.    The defeat devices described above readily explain the high real world emissions of nitrogen oxides;

    b.    Volkswagen and Audi would be subject to significant penalties if they admitted to regulators that defeat devices caused the emissions discrepancies;

    c.    Volkswagen could be required to buy back the vehicles if it could not bring the emissions down with a software update; and

    d.    If Volkswagen opted to stay silent, EPA or CARB could obtain vehicles and conduct emissions testing that would reveal the existence of the defeat devices.

148.    In a May 23, 2014 letter to Martin Winterkorn, CEO and Chairman of Volkswagen AG's Board of Managers, Group Quality Assurance head Frank Tuch warned:

> A thorough explanation for the dramatic increase in $NO_x$ emissions cannot be given to the authorities. It can be assumed that the authorities will then investigate the VW systems to determine whether Volkswagen implemented a test detection system in the engine control unit software (so-called defeat device) and, in the event a "treadmill test" is detected, a regeneration or dosing strategy is implemented that differs from real world driving conditions. In Drivetrain Development, modified software versions are currently being developed which can reduce the RDE, but this will not bring about compliance with the limits, either. We will inform you about further development and discussion with the authorities.

149.    With the risks of detection in mind, Volkswagen embarked on a strategy to deflect public scrutiny. It publicly denied that the Subject Vehicles failed emissions requirements.

150.    It neutrally acknowledged the existence of the problem of apparent excess emissions, without explaining the known cause to authorities or involving Volkswagen AG Group Product Safety, to maintain the illusion that the problem was insignificant.

151.    And it proposed software updates to "optimize" the emissions on the Generation 1 and 2 vehicles.

152.    Yet, as the executives at Volkswagen AG, Audi AG, Volkswagen Group of America, Inc., and Audi of America, LLC who worked on the damage control well knew, the proposed software modifications would:

　　　　　a.    Only bring the Generation 1's emissions down to ten times the legal limits, while at the same time increasing fuel consumption;

　　　　　b.    Only bring the Generation 2's emissions down to five times the legal limits;

　　　　　c.    Only bring the Generation 3's (*i.e.,* all model year 2015 Subject Vehicles with 2.0 liter engines, about to roll off the production line) emissions down to double the legal limits; and

　　　　　d.    In the case of the Subject Vehicles equipped with selective catalytic reduction, nearly double urea dosing requirements, thereby necessitating additional urea tank refills for a significant portion of drivers.

153.    And so began Defendants' campaign from May 2014 until September 2015 (and beyond for the 3LL Subject Vehicles) to mislead and confuse regulators and the public about the true cause of the high real-driving emissions of nitrogen oxides discovered by the ICCT Report: illegal defeat devices.

33

ii.     **Volkswagen's attempts to deflect regulatory scrutiny from model year 2015 Generation 3s about to hit the United States market**

154.    One of the most pressing dilemmas facing Volkswagen after the release of the ICCT Report related to the model year 2015 Generation 3s, equipped with selective catalytic reduction, that were set to roll off the production line a few months later for delivery in the United States with the illegal defeat devices installed.

155.    In or around March 2014, just before the ICCT Report was released, Volkswagen applied to EPA and CARB to certify model year 2015 Generation 3s to the Low Emission Vehicle III standard, a more stringent standard than the Low Emission Vehicle II standard to which they had certified earlier model year 2009 – 2014 2.0 Subject Vehicles. *See* 40 C.F.R. § 86.

156.    With the publication of the ICCT Report and the resulting intense scrutiny from regulators, Volkswagen was under immediate pressure to bring the Generation 3s into actual compliance with LEV III standards as quietly and quickly as possible.

157.    With respect to the urea dosing, in particular, Volkswagen estimated that even to bring emissions down to within two times the legal limits, urea dosing would need to nearly double from 0.81 liter per thousand miles up to 1.51 liters per thousand miles. And, even then, accordingly to Volkswagen's own estimates, twenty percent of Generation 3 owners would have to refill their urea tanks well before ten thousand miles.

158.    Unwilling to come clean with United States. regulators, Volkswagen decided to use an impending change to EPA rules, effective September 8, 2014, that permitted automakers to decouple urea tank refills from service intervals as a pretext to update the software in the Generation 3s waiting in United States ports, turning down the defeat device and increasing the urea dosing during real world driving, before regulators or consumers got their hands on the cars.

34

Emergency Vehicle Rule – SCR Maintenance and Regulatory Flexibility for Nonroad Equipment. 79 Fed. Reg. 46356 (Aug. 8, 2014).

159.    In early June 2014, Volkswagen submitted revisions to its applications for certification to EPA and CARB changing the anticipated urea refill intervals from ten thousand miles to approximately ten thousand miles.

160.    Sensitive that the potentially increased number of urea refills and impact on drivability (vehicles with empty urea tanks cannot be started) brought "significant rejection reason to potential buyers," Volkswagen also began discussing how to announce and message the change to dealers and consumers.

161.    Given the time constraints and the significant threat to future sales, Volkswagen treated this matter with urgency and involved many executives and engineers at Volkswagen AG, Audi AG, Volkswagen Group of America, Inc., and Audi of America, LLC.

162.    Volkswagen's communications to dealers and the public regarding the changes in urea consumption for the Generation 3s falsely and misleadingly:

> a.    Suggested that the vehicles would meet EPA and CARB emissions standards;
>
> b.    Did not mention that emissions of nitrogen oxides in real world driving conditions would be as much as double legal limits;
>
> c.    Claimed that only customers with aggressive driving styles would see reduced intervals between urea refills; and
>
> d.    Suggested that older Generation 2s equipped with selective catalytic reduction would not require increased urea dosing to comply with LEV II emissions standards.

### iii.    Volkswagen's attempt to placate United States regulators by offering deceptive, sham software recalls on the Generation 1s and Generation 2s

163.    At the same time, it was covertly managing the Generation 3 defeat device issue, Volkswagen was also attempting to downplay the scope and severity of the problem with the Generation 1 and Generation 2 Subject Vehicles.

164.    At an October 1, 2014 teleconference with CARB, Volkswagen proffered phony technical explanations for high emissions and assured regulators it could "optimize" the vehicles' emissions performance by conducting software recalls.

165.    In its November 26, 2014 and December 12, 2014 recall-related submissions to EPA and CARB, Volkswagen touted the Generation 2 software recall as a "pro-active" "upgrade."

166.    Volkswagen's description of the corrective action to CARB and EPA stated:

- Improvements have been made with regard to the PM filter loading / regeneration model. The updated software incorporates the latest engineering experiences to enhance the accuracy of the PM filter model. The implemented changes do not have a negative impact on the K1-factor determination or influence the on road performance of the vehicle.

- Improvements have been made ensuring a higher Ammonia filling level of the SCR catalyst. This ensures that the SCR catalyst is more robust against $NO_x$ peaks caused by dynamic and transient speed / load changes. The new software incorporates the latest engineering experiences to enhance the efficiency of the SCR system.

167.    Similarly, their notices to dealers and consumers stated, "the vehicle's engine management software has been improved to assure the vehicle's tailpipe emissions are optimized and operating efficiently."

168.    The customer letter erroneously stated that Volkswagen was undergoing the software recall "[a]s part of Volkswagen's ongoing commitment to our environment, and in cooperation with the United States Environmental Protection Agency."

169.     Volkswagen's March 2015 recall-related submissions concerning the Generation 1s' software update similarly described the recalls as "pro-active" "upgrade[s]."

170.     Volkswagen erroneously stated through those submissions that the software update would "pose no impact to fuel economy."

171.     Similar to the earlier recall notices, Volkswagen told dealers and customers that "the vehicle's engine management software has been improved to assure the vehicle's tailpipe emissions are optimized and operating efficiently."

### iv.     Audi's efforts to deflect United States regulators' suspicions about the 3Ls

172.      Around the same time Volkswagen was meeting with regulators to describe the proposed 2L recalls and offering different improbable reasons for the apparent excess emissions of nitrogen oxides the recalls were meant to fix, the regulators' suspicions about the 3Ls began to build.

173.     Indeed, beginning in the fall of 2014, Audi ran internal portable emissions testing on multiple 3Ls and discovered that real world emissions of nitrogen oxides were many times higher than legal limits.

174.     In February 2015, Audi communicated to CARB that its testing had revealed a model year 2016 Audi A8 V6 diesel had "emissions at a level of three times the $NO_x$ ULEV II [full useful life] standard."

175.     Audi explained to CARB the discrepancy between the dynamometer and the portable emissions testing as being a result of "increased driving dynamics in combination with a lot more unsteady driving characteristics" and the peculiarities of Los Angeles driving.

176.     Audi further asserted to CARB that:

[T]he temporary reduction of the [selective catalytic reduction] effectiveness is caused by the underfloor position of the [selective catalytic reduction] system and

37

therefore represents a physical boundary of the technical capability of the system and no intervention in the control strategy. Therefore Volkswagen concludes that the current [selective catalytic reduction]-application fulfills the requirement of the [auxiliary emission control device] regulation. As a consequence Audi requests an unconditional [Executive Order].

177.    Audi did not disclose results from portable emissions testing of earlier and current 3LL models that were considerably worse – indicating emissions of nitrogen oxides up to ten times the legal limit.

178.    Audi only disclosed that it intended to alter the applicable software to improve real-world emissions for future 3L models.

     **v.      Volkswagen's continuing efforts to mislead United States regulators**

179.    During the spring of 2015, CARB made several requests for information concerning: (a) whether the software updates for Generation 1s and Generation 2s had brought the vehicles into compliance with applicable standards; and (b) whether the 2016 Generation 3s and the 3LLs, which EPA and CARB had not yet certified, had the same issues.

180.    CARB officials followed up multiple times, requesting more information from Volkswagen related to the software's control of urea dosing on the 2016 models of the 2Ls and 3Ls for which Volkswagen was then seeking certification.

181.    Upon learning that CARB planned to conduct confirmatory testing of an updated Generation 2 using consecutive test cycles on the dynamometer, internal emails between engineers at Volkswagen AG and Volkswagen Group of America, Inc., Engineering and Environmental Office took on a more panicked tone.

182.    In a May 18, 2015 email to several managers and engineers within Volkswagen AG's Powertrain Development Department and to Engineering and Environmental Office head Stuart Johnson, Volkswagen AG engineering executive Juergen Peter expressed concern about

what CARB's new testing would show, asking his colleagues, "Do we need to discuss next steps?"

183.    With respect to CARB's questions regarding particulate matter clogging the diesel particulate filter, Peter asked, "Come up with the story please!"

184.    Similarly, a May 21, 2015 email from Mike Hennard, Senior Manager of Emissions Compliance at Volkswagen Group of America, Inc., Engineering and Environmental Office to multiple Volkswagen AG managers and engineers stated:

> Please be aware that this type of action from California ARB staff/management is not a normal process and that we are concerned that there may be possible future problems/risks involved. It should also be noted that this TDI software issue is being reviewed and monitored by upper management at ARB.

185.    After receiving the above-described email from Hennard, one of the senior managers wrote an email to Hennard's manager criticizing him for allowing a staffer to send such an open email to those recipients.

186.    In June 2015, CARB conducted confirmatory testing on a 2012 Passat, a Generation 2 equipped with selective catalytic reduction.

187.    Based on the June 2015 testing, CARB notified Volkswagen that it concluded:

> VW's "Fix" Calibration [does not] directly address the lack of [urea] dosing filling strategy on some drive cycles. VW's "Fix" Calibration does not directly address high $NO_x$ emissions on drive cycles extending beyond 1,400 seconds. VW's [urea] filling strategy is still only invoked once per drive cycle; therefore $NO_x$ emissions will continue to increase as the drive cycle progresses. VW's "Fix" Calibration does not address why or when the filling strategy is invoked. Some drive cycle [sic] may never activate the [urea] filling strategy.

188.    CARB then indicated it could not certify 2016 Generation 3s until the agency received confirmation that those vehicles did not have the same parameters for urea dosing as the updated Generation 2s, which had already failed CARB's confirmatory testing.

**F.    Volkswagen admitted its misconduct on the 2Ls only when it thought doing so would lead to certification of the 2016 Generation 3s.**

189.    Volkswagen's repeated attempts to convince CARB that the "Gen 3 2016 [model year] did not share the [Gen 2] strategy or concern" did not work.

190.    On or about July 20, 2015, after learning that CARB planned to test a 2015 Generation 3 vehicle, Volkswagen Group of America, Inc., Engineering and Environmental Office head Stuart Johnson internally suggested the approach of "discussing a 'working mistake' with [C]ARB" and further suggested that "how we handle this could be a positive step if we tie it to the refill interval and dosing strategy."

191.    In a July 21, 2015 email, Volkswagen Group of America, Inc. President and CEO Michael Horn conveyed the urgency of the situation to multiple board members and executives in Germany, including Christian Klinger, the Volkswagen AG Management Board member responsible for Sales and Marketing, and Heinz-Jakob Neusser, the Volkswagen Passenger Car Board member responsible for Technical Development.

192.    In the July 21, 2015 email, Horn made clear that certification of the 2016 Generation 3s was at risk if Volkswagen did not provide CARB with all of the information requested by the agency.

193.    On or about August 5, 2015, Volkswagen AG Engine Development head and former Volkswagen Group of America, Inc., Engineering and Environmental Office head, Oliver Schmidt, and Volkswagen Group of America, Inc., Engineering and Environmental Office head Stuart Johnson met with CARB management and admitted that, even after the software recalls, the Generation 1s and Generation 2s did not meet legal requirements for emissions of nitrogen oxides.

194.   On August 12, 2015, still withholding certification for the 2016 Generation 3s, CARB staff again requested Volkswagen provide "the exact parameters that control [Generation 3 urea] dosing and show the before & after calibration difference that corrected the lack of dosing issues found during our [Generation 2] testing."

195.   After extensive internal discussion by and among multiple high level executives at Volkswagen AG and Volkswagen Group of America, Inc., Engineering and Environmental Office, in which Stuart Johnson expressed doubts about the possibility of giving CARB the requested information "given the complication of today's code," Volkswagen decided not to provide the requested information.

196.   Volkswagen AG had Johnson reiterate to CARB the "same message Oliver [Schmidt] brought last week when we both met with [CARB officials], which is a partial admission that concern of the 10K refill interval is another parameter that influences the dosing and that is why he is not always seeing the dosing at the enabling temperature."

197.   Yet, CARB continued to ask for the same information. Johnson reported in an August 12, 2015 email to multiple high-level executives, managers, and engineers at Volkswagen AG that CARB "still asked for information. This is not a new request. [CARB] has asked for the parameters in the calibration of Gen 2 that are limiting the dosing to ensure that it is not in Gen 3."

198.   On August 18, 2015, Volkswagen AG Drivetrain Development head Friedrich Eichler sought authority from then-Volkswagen Passenger Car Board member and head of Engine Development Heinz-Jakob Neusser to send multiple Volkswagen AG diesel department heads (together with current and former heads of Volkswagen Group of America, Inc.

Engineering and Environmental, Stuart Johnson and Oliver Schmidt) to meet with CARB the following day, August 19, 2015.

199.    The express goal of the meeting was to secure the release of the 2016 Generation 3s and to convince CARB that Volkswagen would be able to implement measures to reduce the Generation 2s' real driving emissions to an acceptable level within an agreed timeframe. To do that, they agreed to – again – acknowledge problems in the Generation 1s and Generation 2s, promise another software update to the Generation 2s in mid-2016, and continue to assure CARB that the lessons learned from the Generation 2 issues had informed and improved the emissions controls in the Generation 3s.

200.    Consistent with the agreed-upon approach, Volkswagen gave a technical presentation to CARB entitled "Technical Information to enable ARB to issue the MY16 – Gen 3 certification" that generally described the modifications to the Generation 3 dosing strategy as compared to the Generation 2s, and generally described the inputs, but did not provide the actual values that enabled or disabled urea dosing or admit any time- or distance-related inputs.

201.    CARB continued to ask for the same information it had previously requested.

202.    CARB obtained a 2016 Generation 3 vehicle for testing on August 26, 2015, making discovery of Defendants' emission cheating scheme virtually unavoidable.

203.    Volkswagen management knew that they needed to provide CARB the requested information and expressly recognized that the potential financial liability necessitated creation of reserve funds. Yet Defendants were unsure whether and to what extent they should disclose other functions controlled by the defeat devices, namely the lean trap regeneration and exhaust gas recirculation.

204.    On September 3, 2015, at a meeting attended by multiple CARB officials, Volkswagen AG executives and managers, and Volkswagen Group of America, Inc., Engineering and Environmental Office head Stuart Johnson, Volkswagen finally admitted to CARB that Generation 2s contained an illegal defeat device and disclosed the existence of "test recognition software and engine map/dosing changes between road and chassis dyno."

205.    At that September 3, 2015 meeting, Volkswagen also finally admitted that the Generation 2 engine control units had two calibrations – one for real world driving and one for emission testing.

206.    Volkswagen disclosed that during real world driving, the engine control unit ensured that urea dosing, exhaust gas recirculation, and rail pressure were lower than during emission testing. Volkswagen also provided greater detail regarding the parameters that switched on the different calibrations.

207.    On September 18, 2015, CARB sent an "In-Use compliance" letter to Volkswagen describing its investigation of the "reasons behind these high $NO_x$ emissions observed on their 2.0 liter diesel vehicles over real world driving conditions[]" and its related discussions with Volkswagen. According to CARB, those discussions "culminated in VW's [September 3, 2015] admission to CARB and EPA staff that it has, since model year 2009, employed a defeat device to circumvent CARB and the EPA emission test procedures."

208.    The same day, the EPA issued to Volkswagen a Notice of Violation reflecting the agency's determination that:

> VW manufactured and installed defeat devices in certain model year 2009 through 2015 diesel light-duty vehicles equipped with 2.0 liter engines. These defeat devices bypass, defeat, or render inoperative elements of the vehicles' emissions control system that exists to comply with [Clean Air Act] emission standards... Additionally, the EPA has determined that, due to the existence of the defeat devices in these vehicles, these vehicles do not conform in all material

respects to the vehicle specifications described in the applications for the certificates of conformity that purportedly cover them.

**G. Even facing formal action concerning the 2Ls, Audi and Volkswagen continued to deny that 3Ls had defect devices**

209.   Defendants continued to deny the existence of the defeat device in the 3Ls.

210.   At the same time, however, managers and engineers at Audi AG and Volkswagen Group of America, Inc., Engineering and Environmental Office were discussing how to disclose to CARB the existence of time- and temperature-based urea dosing and exhaust gas recirculation software strategies in the 3Ls, without expressly acknowledging the presence in those vehicles of defeat devices similar to those that Volkswagen admitted were in the Generation 2 vehicles.

211.   CARB conducted its own special cycle testing on a Model Year 2016 Audi A6 and a Model Year 2014 Volkswagen Touareg, both Generation 3s.

212.   Thereafter, EPA and CARB issued a second round of notices issued on November 2, 2015, which notified Volkswagen that regulators had conducted defeat device screening and certification testing on these Generation 3s vehicles and "observed the same type of emissions behaviors as those in which VW has admitted defeat devices exist. These activities corroborate testing conducted by U.S. EPA and Environment Canada on a 2014 VW Touareg (Test Group EADXT03.02UG) and a 2015 Porsche Cayenne (Test Group FPRXT03.0CDD), respectively. This testing has also yielded evidence of a defeat device."

213.   On November 20, 2015, CARB issued a press release reporting that in a November 19, 2015 meeting with EPA and CARB, "VW and AUDI told EPA and CARB that the issues raised in the In-Use Compliance letter extend to all 3.0 liter diesel engines from model years 2009 through 2016.

214.     Thereafter, in an In-Use Compliance Letter dated November 25, 2015, CARB confirmed its determination "that all 3.0 liter model years 2009-2016 test groups of the [Audi AG, Porsche AG, Porsche Cars North America, Volkswagen AG, and Volkswagen Group of America, Inc.] are in noncompliance with CARB standards[.]"

**H. Volkswagen's announcement of a partial settlement with the United States, California and other states, and the private plaintiffs' group does not address Wyoming's claims for environmental penalties and does not fully address Wyoming's claims for injunctive relief.**

215.     On June 28, 2016, Volkswagen announced a partial settlement of the claims asserted against it by litigants in a multidistrict litigation pending in the United States District Court for the Northern District of California. The terms of the partial settlement, which was approved by the court on October 25, 2016, require Volkswagen to, among other things, (a) either buyback or fix the 2L Subject Vehicles and provide owners and lessees with additional compensation; (b) establish an environmental mitigation fund in the amount of $2.7 billion to fund projects in all states to reduce emissions of nitrogen oxides; and (c) invest $2 billion ($800 million in California, $1.2 billion in other states) over ten years to improve infrastructure, access, and education to support zero emission vehicles.

216.     In separate partial settlements announced the same day, Volkswagen agreed to pay civil penalties to over forty states, including Wyoming, of approximately $1,100 per car solely for Defendants' claimed violations of the consumer fraud laws of these states.

217.     The partial settlements do not address or resolve any claims for civil penalties for Defendants' numerous environmental violations.

218.     Although the settlements contemplate resolution of injunctive relief claims to mitigate the environmental damage caused by the 2Ls, they do not contemplate resolution of injunctive relief claims to mitigate the environmental damage caused by the 3Ls.

219. Even the injunctive relief claims related to the 2Ls will not be fully resolved until and unless the proposed mitigation trust agreement is finalized and executed by a designated state agency.

220. In the partial settlements, Volkswagen admits to:

a. Installing software in 2L Subject Vehicles that "results in emissions that exceed EPA-compliant and CARB-compliant levels when the vehicles are driven on the road; and

b. Failing to disclose the existence of these defeat devices in Volkswagen's applications to regulators, so that "the design specifications of the 2.0 Subject Vehicles, as manufactured, differed materially from the design specifications described" in those applications."

## CLAIMS FOR RELIEF

221. Plaintiff is entitled to a judgment for penalties and injunctive relief under the Clean Air Act and the Wyoming Environmental Quality Act. 42 U.S.C. § 6704; Wyo. Stat. Ann. § 35-11-901(a).

222. Any person who violates any provision of the Wyoming State Implementation Plan is subject to the assessment of civil penalties of not more than $32,500 per violation per day for each violation occurring between March 15, 2004 and January 12, 2009, and not more than $37,500 per violation per day for each violation occurring after January 12, 2009. 42 U.S.C. § 7413(b)(1); 40 C.F.R. § 19.4.

223. Any person who violates any provision of the Wyoming Environmental Quality Act or the Air Quality Rules "is subject to a penalty not to exceed ten thousand dollars

($10,000.00) for each violation for each day during which violation continues."
Wyo. Stat. Ann. § 35-11-901(a).

### Claim I – Concealing Emissions

224.   Plaintiff repeats and incorporates by reference the allegations contained in Paragraphs 1 – 223 of this Complaint.

225.   As of November 1, 2015, approximately one thousand one hundred ninety-six (1,196) Subject Vehicles were registered with the Wyoming Department of Motor Vehicles.

226.   Non-Wyoming residents drive additional Subject Vehicles through the State, including residents of neighboring states who work in Wyoming and out-of-state tourists.

227.   Each Subject Vehicle driven in Wyoming is individually a "source" under the Air Quality Rules and Wyoming's State Implementation Plan. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 1, § 3; 40 C.F.R. § 52.2620, subpart ZZ.

228.   Defendants installed software in the Subject Vehicles that conceals the vehicles' actual emissions of nitrogen oxides by activating air pollution control systems only when the vehicles are undergoing emissions testing and not during normal on-road operating.

229.   A separate violation occurs each day a Subject Vehicle is driven in Wyoming, in violation of the Wyoming's State Implementation Plan, the Wyoming Environmental Quality Act, and the Wyoming Air Quality Standards and Regulations. 42 U.S.C. § 7604; Wyo. Stat. Ann. § 35-11-901(a); *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 1, § 4.

### Claim II – Tampering

230.   Plaintiff repeats and incorporates by reference the allegations contained in Paragraphs 1 – 229 of this Complaint.

231.     As of November 1, 2015, approximately one thousand one hundred ninety-six (1,196) Subject Vehicles were registered with the Wyoming Department of Motor Vehicles.

232.     Non-Wyoming residents drive additional Subject Vehicles through the State, including residents of neighboring states who work in Wyoming and out-of-state tourists.

233.     Each Subject Vehicle driven in Wyoming is individually a "source" under the Air Quality Rules and Wyoming's State Implementation Plan. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 1, § 3; 40 C.F.R. § 52.2620, subpart ZZ.

234.     Each Subject Vehicle driven in Wyoming is individually a "motor vehicle" under the Air Quality Rules and Wyoming's State Implementation Plan. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 1, § 3; 40 C.F.R. § 52.2620, subpart ZZ.

235.     Defendants intentionally installed software on the Subject Vehicles that renders certain air pollution control devices and systems required under federal law, inoperable or ineffective during normal driving conditions.

236.     A separate violation occurs each day a Subject Vehicle is driven in Wyoming, in violation of the Wyoming Environmental Quality Act, the Wyoming Air Quality Standards and Regulations, and Wyoming's state implementation plan. 42 U.S.C. § 7604; Wyo. Stat. Ann. § 35-11-901(a); *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 13, § 2.

### PRAYER FOR RELIEF

Plaintiff requests that this Court provide the following relief:

A.  Order Defendants to pay civil penalties up to the statutory maximum for each day of each violation alleged in the Complaint;

B.  Order Defendants:

1. Develop a schedule to bring all Subject Vehicles into compliance with Wyoming state air quality laws and the Wyoming state implementation plan; or, in the alternative

2. Propose an emissions mitigation plan to offset any excess emissions it cannot correct;

C. Award Plaintiffs attorney fees and costs pursuant to 42 U.S.C. § 7604(d); and

D. Grant Plaintiff such further relief as this Court may deem just and proper.

**DATED** this ____ day of November 2016.

Peter K. Michael
Wyoming Attorney General

James Kaste
Deputy Attorney General

Elizabeth Morrisseau (#7-5307)
Assistant Attorney General

Kendrick Building
2320 Capitol Avenue
Cheyenne, WY 82002
Ph: (307) 777-6946
Fax: (307) 777-3542
james.kaste@wyo.gov
elizabeth.morrisseau@wyo.gov